# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ABDELNASER J. AL-HASAN,**
                    **Plaintiff,**

      **v.**                                                    **Case No. 14-C-0611**

**MILWAUKEE SCHOOL OF ENGINEERING,**
                    **Defendant.**

---

## DECISION AND ORDER

Abdelnaser J. Al-Hasan alleges that the Milwaukee School of Engineering ("MSOE"), his former employer, discriminated against him in violation of Title VII of the Civil Rights Act of 1964. Before me now is MSOE's motion for summary judgment. See Fed. R. Civ. P. 56.

## I. BACKGROUND

The plaintiff is Muslim and Palestinian. He earned his PhD in Mathematics from the University of Wisconsin–Milwaukee ("UWM"). MSOE is a private, non-profit university located in Milwaukee, Wisconsin, which offers bachelor's and master's degrees in engineering, business, mathematics, and nursing. This lawsuit arises out of MSOE's failure to promote the plaintiff from a part-time, adjunct position in MSOE's mathematics department to a position on what MSOE calls its "full-time faculty." MSOE does not have a tenure system, but its full-time faculty positions at the professor level (i.e., full-time positions that have the word "professor" in the title) are somewhat analogous to tenured positions. Full-time professors enjoy multi-year appointments, have a formal review process, and receive other job protections that are not available to part-time faculty.

MSOE has a position entitled "Instructor" that is classified as a full-time faculty position, but those holding the Instructor position are not professors and do not enjoy multi-year appointments, participate in the review process, or receive the other protections afforded to full-time faculty at the professor rank. The plaintiff sought to be promoted to the full-time faculty at the professor level and was not interested in becoming an Instructor.

The plaintiff first applied to work at MSOE in January 2007. At that time, Dr. Karl David, the chair of the mathematics department, interviewed the plaintiff in person. Following the interview, David recommended to MSOE's President and Vice President of Academics, who make the final hiring decision, that they hire the plaintiff as a part-time adjunct associate professor in the mathematics department. When he made the recommendation, David knew of plaintiff's race and national origin and knew that he was Muslim. The plaintiff was offered the position, and he accepted it and began teaching in the fall of 2007. At the time the plaintiff was offered the position, David told him that he expected the mathematics department to begin searching for a new full-time professor during the 2007–08 academic year. According to the plaintiff, David told him that if he applied for the full-time position, he would have an advantage over the other candidates. However, David did not promise the plaintiff that he would get the position, and he informed him that the department would consider other candidates during its search.

In the fall of 2007, as David expected, the mathematics department began searching for a new full-time faculty member. The plaintiff submitted an application. As of that time, the mathematics department had just hired two other full-time professors, Dr. Ksenyia Fuhrman and Dr. Bruce O'Neill. Prior to becoming full-time professors, O'Neill and Fuhrman had both been part-time faculty at MSOE. Also, they both held PhDs from UWM.

2

With the hires of Drs. Fuhrman and O'Neill, one-half of the full-time faculty in MSOE's mathematics department had PhDs from UWM.

As indicated above, when hiring new faculty members, the mathematics department only recommends candidates to MSOE's Vice President of Academics and its President. These two administrators make the final hiring decisions. During the time that the plaintiff worked for MSOE, the administrators always hired the candidate recommended by the department. However, after the department recommended Fuhrman and O'Neill, and the administrators approved their hire, the Vice President of Academics, who at that time was Dr. Roger Frankowski, sent an email to Dr. David in which he instructed David not to recommend anyone with a graduate degree from UWM to fill the next vacancy:

> Karl:
>
> The Math position was approved. However, please do not interview anyone from UWM—we need some people with different credentials in the department.
>
> Rog

Decl. of Karl David Ex. A, ECF No. 44-1. Because of this instruction, David was forbidden from considering the plaintiff for the full-time vacancy in 2007. David then wrote the following email to Frankowski:

> Any advice for telling Naser Al-Hasan, whom we hired part-time from UWM to fill the shortfall and who's teaching a full load and volunteering for everything in sight in hopes of getting a permanent job here, to either accept being part time indefinitely or look for a permanent position?

Id. Dr. Frankowski responded, "[p]erhaps at some point in time when another UWM person retires, I would re-open, but otherwise, I see the system as perpetuating itself." Id. David then informed the plaintiff that he would not be considered for the open full-time

3

faculty position because of Frankowski's policy against hiring new faculty members with degrees from UWM.

During its search in 2007, MSOE's mathematics department received applications from outside candidates who held PhDs from UWM. As was the case with the plaintiff, the mathematics department did not consider those applicants for the position. Eventually, the department recommended Dr. Chunping Xie for the position, who did not have any degrees from UWM. The Vice President and President approved his hire.

Following his disqualification from the 2007 search, the plaintiff continued teaching at MSOE on an adjunct basis. Although the plaintiff was classified as part-time faculty, he taught full-time course loads each semester.

In January 2008, the son of a math-department faculty member, Nancy Olmsted, died while fighting as a soldier in Iraq. Thereafter, the plaintiff felt "tension" in the department that he believed was directed at him because he was Arabian and Muslim. Al-Hasan Dep. at 88–89, ECF No. 55-1. According to the plaintiff, Dr. David was especially affected by the death of Olmsted's son, and the plaintiff believes that David "made it his personal agenda" to prevent the plaintiff from becoming a full-time professor. Id.

The plaintiff contends that, at some point during his employment at MSOE, another math-department faculty member, Edward Griggs, told the plaintiff that he explained to other faculty members, including Dr. David, that the plaintiff was not an "extreme Muslim." Al-Hasan Dep. at 92–95. The plaintiff was not present for the conversation with the other faculty members, and he does not know what prompted Griggs to explain to the others that the plaintiff was not an extreme Muslim. Id.

4

On June 17, 2010, Dr. David wrote an email to the campaign of then-Congressman Mark Kirk, who was a candidate for the U.S. Senate in Illinois. The subject line of the email stated "doing enough for Israel?" and the body stated as follows:

> Congressman Kirk,
>
> I just got an appeal to support your campaign for the Senate based on your strong support for Israel. You have indeed done a lot, but there's still a lot more you could do! Shouldn't you be campaigning for blank-check U.S. support for unrestricted, wholesale Jewish settlement of the entire West Bank, evicting all those troublesome Palestinians from their "homes" [we know they don't really belong there even if they have been squatting there for centuries] until the West Bank is entirely Jewish? Great idea, huh? You're welcome.

Al-Hasan Decl. Ex. A, ECF No. 53-1 (Deposition Exhibit 8) (brackets in original). David forwarded a copy of this email to the plaintiff. According to David, the email was meant to be sarcastic, and he was criticizing Kirk's stance on the Israeli-Palestinian conflict. David states that he shared the email with the plaintiff in order to show his solidarity with the plaintiff, whom he knew to be Palestinian, and to express his sympathy for the plight of the Palestinians. David Decl. ¶ 8, ECF No. 44. The plaintiff testified at his deposition that he does not know whether David's email was meant to be sarcastic. Al-Hasan Dep. at 97.

At some point during the plaintiff's employment at MSOE (it is not clear when), Dr. David posted on the department's bulletin board a Christmas card that the department received from a job applicant. The plaintiff contends that David's posting the Christmas card could be construed as exhibiting a bias against Muslims. At his deposition, Dr. David stated that he was not himself a Christian (he identifies as atheist) and explained his reasons for posting the Christmas card as follows:

> I thought it was kind of funny, if not pathetic, that someone, a job applicant, could think that they could influence the committee by sending them a

5

greeting card . . . . [I]t was addressed to the entire search committee, so I just put it on the board without comment and let people, you know, draw their own conclusions.

David Dep. at 74–76, ECF No. 55-2.

At another point during the plaintiff's employment at MSOE (again, it is not clear when), David posted on the department's bulletin board an advertisement for a faculty position in Alaska. The advertisement included a fishing scene. David at one point remarked to the plaintiff that he should consider applying for the job because of the great fishing in Alaska. The plaintiff is an avid fly fisherman who founded a fly-fishing club at MSOE. However, the plaintiff understood the comment as a hostile one, implying that David wanted the plaintiff to move to Alaska.

In May 2010, a full-time instructor in the mathematics department announced that she would retire at the end of the 2010–11 academic year. The department decided to replace this instructor with a full-time professor. When the plaintiff heard about the retirement and the opening for the full-time faculty, the plaintiff wrote an email to David in which he stated that he "expected" the department to offer the full-time position to him. Def. Prop. Finding of Fact ("PFOF") ¶ 55 (admitted). Later, the plaintiff sent Dr. David an email in which he asked if the UWM hiring restriction was still in effect:

> My application during the last search was rejected because I was a graduate of UWM and the department had just hired two faculty members with degrees from UWM, understood. Before I start putting my application together for this new position, can you please let me know if the administration has given you any restrictions on who and from where the department can hire?

Decl. of Schmidt Jones Ex. D, ECF No. 41-4 at 70.

6

Before the start of the 2010 academic year, Dr. Frederick Berry had replaced Dr. Frankowski as the Vice President of Academics. David intended to discuss with Berry whether he would continue Frankowski's policy of not hiring new faculty members with PhDs from UWM. However, on November 2, 2010, before David had discussed the UWM restriction with Berry, the plaintiff met with Berry in person to discuss a conference the plaintiff was organizing. At that meeting, Berry asked the plaintiff why he was not yet a full-time faculty member, and the plaintiff told him it was because of the administration's restriction against hiring UWM PhDs. According to the plaintiff, Berry then told the plaintiff that if he got the approval of the mathematics department, he would take the plaintiff's application to the school president and have the restriction against hiring UWM graduates removed. The plaintiff also contends that Berry told him that if he received the support of the mathematics department, Berry would support "converting" the plaintiff to a full-time professor—i.e., promoting him to the vacant full-time professorship without searching for other candidates. Al-Hasan Dep. at 150. Berry denies making this statement.

Upon learning of the November 2, 2010 meeting between the plaintiff and Berry, Dr. David confronted the plaintiff and was upset that the plaintiff had gone over his head. However, David then had his own meeting with Berry and told Berry that he would like to see the UWM restriction removed and would like to allow the plaintiff to be a candidate for the vacant full-time position. Def. PFOF ¶ 64 (admitted). Berry stated that if the department recommended the plaintiff to fill the vacancy, he would approve that choice. Berry also confirmed with the President of MSOE, Dr. Hermann Viets, that the department could hire a candidate with a PhD from UWM.

7

On November 7, 2010, Dr. David called a meeting of the full-time faculty members within the mathematics department to vote on whether to convert the plaintiff's part-time position to a full-time professorship without first conducting a search for other candidates. The plaintiff was not present for the meeting. The faculty members voted in favor of conducting a search and against converting the plaintiff's position by a vote of 6–2. According to the plaintiff, before taking the vote, Dr. David informed the faculty members that he had surveyed other department chairs in the school and learned that the common practice was to conduct a search rather than simply convert an existing part-time instructor to full-time faculty. The plaintiff also contends that, in the week prior to the meeting, two of the other faculty members, Griggs and Olmsted, told him that David had been telling faculty members that the school's president, Viets, would not accept the conversion of the plaintiff's position without a search. Following the vote, Olmsted told the plaintiff that she thought the faculty felt that it was best to have a search so that Viets would "sign [plaintiff's] employment." Def. PFOF ¶ 70 (admitted).

After the faculty voted to proceed with a search rather than promote the plaintiff without a search, the plaintiff went to MSOE's human-resources department and asked to file a grievance against MSOE for discrimination. The plaintiff had a discussion with someone in human resources about the mathematics department's decision to proceed with a search rather than automatically promote him. However, he never filed a written grievance. As far as the record reveals, human resources did not inform anyone in the mathematics department about its discussion with the plaintiff or his request to file a grievance.

After the faculty voted to proceed with a search, the plaintiff decided to apply. He then solicited letters of recommendation from five faculty members in the mathematics department to include with his application. These five faculty members were also members of the committee that would select the department's recommended candidate. In early March 2011, Dr. Berry received an anonymous letter from a member of the mathematics department's search committee advising Berry that five of nine members of the search committee had written letters of recommendation for one of the candidates and that he or she viewed their doing so as procedurally improper. Berry then emailed David to ask him if the information in the anonymous letter was correct, and he also told David that if it was correct, MSOE would have "a legal problem with EEOC." ECF No. 41-4 at 81. In reply, David stated that it was remiss of him not to think about "the clear conflict of interest here" and that he would discuss the matter with the search committee. Id. Eventually, David told Berry that the department had decided to cancel the pending candidate search and start the process over the following year. Berry supported that decision, and the search was canceled. MSOE did not hire anyone for the open full-time faculty position in 2011.

On June 22, 2011, the plaintiff filed a discrimination complaint with the Wisconsin Equal Rights Division, which was cross-filed with the Equal Employment Opportunity Commission. He alleged that MSOE failed to promote him to the full-time faculty position on account of his race, religion, and national origin. In July 2011, MSOE's human-resources department notified Dr. David by email that the plaintiff had filed this complaint. Dr. David replied to the email by stating "OMG, I just gave him a vacant office with a window—the first part-time person ever to get that! I hope he doesn't add that to the list of complaints." Deposition Ex. 38, ECF No. 53-16.

9

In the fall of 2011, the mathematics department re-posted the full-time faculty position, and the plaintiff again applied. The department then formed a search committee consisting of seven full-time faculty members: David, Fuhrman, Griggs, O'Neill, Xie, Dr. Ronald Jorgensen, and Dr. Yvonne Yaz. MSOE received approximately 100 applications for the position. Dr. David performed the initial review of the applications and narrowed the number of candidates down to 40. From this group of 40, the committee identified four finalists for the position and invited them to campus to complete the interview process. One of the four candidates was the plaintiff; the other three were white males.

Each of the four candidates invited to campus underwent the same evaluation process, which included interviews and a mock classroom lecture. The plaintiff was offended that the department required him to deliver a mock lecture, as by that time he had been teaching at the school for years and the search committee could have observed one of his actual lectures or reviewed his student-evaluation forms. However, the plaintiff acknowledges that mock lectures are part of the interview process and testified that he is not aware of MSOE's having in the past excepted current faculty members from the mock-lecture portion of the search process. Al-Hasan Dep. at 196–97. The plaintiff admits that he did not prepare for his mock lecture. Id. at 197. But he also contends that the mock lecture was conducted irregularly because a member of the search committee brought her daughter to the lecture and because one member of the committee asked a question that the plaintiff thought was "stupid." Id. at 198–201.

Dr. David asked all members of the search committee to complete a written evaluation form for the candidates following the mock lectures. Each form asked the member completing it to vote "yes" or "no" as to each candidate and contained space to

write comments about the candidates.  The plaintiff received three "yes" votes and three "no" votes from the seven-member committee.   Griggs, O'Neill, and Yaz voted "yes."  David, Fuhrman, and Jorgensen voted "no."  Dr. Xie, in completing his written evaluation, did not vote either "yes" or "no" with respect to the plaintiff or the two other unsuccessful candidates.   Rather, he simply voted "yes" as to one candidate, Dr. Anthony van Groningen.   Dr. van Groningen received six "yes" votes and one "no" vote from the committee.  Of the other two candidates, one received three "yes" votes while the other received zero "yes" votes.

Not all of the committee members included written comments in their evaluation forms.  However, most of those that did were critical of the plaintiff's mock lecture and preferred Dr. van Groningen's lecture.  Fuhrman, for example, stated that plaintiff's lecture was difficult to follow, while van Groningen's was the best.  Jorgensen likewise found the plaintiff's lecture confusing and deemed van Groningen's the best.  O'Neill, even though he voted "yes" as to the plaintiff, stated that "his talk was not impressive" and that van Groningen's talk was "the best."  ECF No. 48-1.  Still, some of the comments about the plaintiff were positive, and van Groningen received some negative comments.

At the completion of the search process, Dr. David recommended Dr. van Groningen as the department's choice to fill the position.  Drs. Viets and Berry then interviewed van Groningen and approved his hire.  The plaintiff admits that David recommended van Groningen as the department's choice because he had "emerged from the candidate search process as the candidate with the broadest support from the faculty search committee members."  Def. PFOF ¶ 110 (admitted).

11

While the plaintiff was participating in MSOE's search process in 2011–12, he was also applying for openings at other colleges. After the department selected van Groningen over him, the plaintiff decided to accept a position at Newberry College in South Carolina. He accepted the position on May 9, 2012 and resigned from MSOE in July 2012.

At some point towards the end of his employment at MSOE, the plaintiff encountered David and a high-school teacher in the hallway. During the encounter, David remarked to the plaintiff that he might give the high-school teacher the plaintiff's office. (Apparently, MSOE sometimes hired high-school teachers to teach at its school and provided them with offices. See Al-Hasan Dep. at 90, 209–10.) The plaintiff interpreted David's remark as an expression of hostility towards him.

In June 2012, the plaintiff filed a second complaint with the EEOC, in which he again alleged that MSOE failed to promote him because of his race, religion, and national origin.

In April 2013, after the plaintiff had left MSOE and filed his charge of discrimination with the EEOC, Dr. David sent the plaintiff information about his (David's) genealogy in an effort to convince the plaintiff that he was not Jewish. Dep. Ex. 39, ECF No. 53-17. David testified at his deposition that he did this because the plaintiff had alleged in his EEOC complaint that David was Jewish. David Dep. at 78–80, ECF No. 55-2.

In February 2014, following the EEOC's issuing him a notice of right to sue, the plaintiff commenced the present action.

## II. DISCUSSION

An employer who discriminates against an employee because of his race, religion, or national origin (among other things), or who retaliates against the employee for complaining about unlawful discrimination, violates Title VII of the Civil Rights Act of 1964,

12

42 U.S.C. §§ 2000e–2, 2000e–3.  In the present case, the plaintiff alleges that MSOE's repeated failures to promote him to the full-time faculty was the result of discrimination against him on the basis of race, religion, and national origin.  He also alleges that the department's failure to promote him to the full-time faculty following the 2011–12 search was retaliation for his having filed a discrimination complaint with the EEOC following the decision to defer the prior year's search.

MSOE has moved for summary judgment on these claims.  Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When considering a motion for summary judgment, I take the evidence in the light most favorable to the non-moving party and may grant the motion only if no reasonable juror could find for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 255 (1986).

At the summary-judgment stage, claims of employment discrimination are evaluated under the "direct" method of proof or the "indirect" method of proof announced in McDonnell Douglas v. Green, 411 U.S. 792 (1973), depending on the kind of evidence the plaintiff presents in opposition to the motion.  Smith v. Chicago Transit Authority, 806 F.3d 900, 904 (7th Cir. 2015).  The "direct" method is a bit of a misnomer: it simply refers to anything other than the McDonnell Douglas indirect approach.  Id.  Under the direct method of proof, the plaintiff can defeat summary judgment by presenting sufficient direct evidence of the employer's discriminatory intent or a convincing mosaic of circumstantial evidence that points directly to a discriminatory reason for the employer's action.  Id. at 904–05.

The indirect method is a formal way of analyzing a discrimination case when a certain kind of circumstantial evidence—evidence that similarly situated employees not in

13

the plaintiff's protected class were treated better—would permit a jury to infer discriminatory intent.  Id. at 905.  The plaintiff must first establish a prima facie case.  In the context of this suit, which involves a failure to promote, the elements of the prima facie case are: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position sought; (3) the plaintiff was rejected for the position; and (4) the employer promoted someone outside the protected group who was not better qualified than the plaintiff.  See, e.g., Garofalo v. Vill. of Hazel Crest, 754 F.3d 428, 439 (7th Cir. 2014).  If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment decision.  Smith, 806 F.3d at 905.  The burden then shifts back to the plaintiff to provide evidence establishing a genuine dispute about whether the employer's stated reason was a pretext for prohibited discrimination.  Id.  "Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." Id. (quoting Wolf v. Buss (Am.) Inc., 77 F.3d 914, 919 (7th Cir.1996)) (internal quotation marks omitted).  Summary judgment for the defendant is appropriate if the plaintiff fails to carry his burden to establish a prima facie case or is unable to show a genuine dispute about whether the neutral reason advanced by the employer was merely pretextual.  Id.

Before proceeding, it is important to identify the precise employment actions at issue in this suit.  They are: (1) the mathematics department's decision in 2010 to search for a new full-time faculty member rather than promote the plaintiff to the full-time faculty without conducting a search for other candidates; (2) MSOE's decision to cancel the search initiated in 2010 and re-post the full-time vacancy the following year; and (3) MSOE's decision to hire van Groningen for the full-time position rather than the plaintiff.

14

In his brief, the plaintiff also seems to contend that MSOE's refusal to consider him for a full-time position in 2007 was discriminatory. However, in his brief in response to the defendant's motion to dismiss the original complaint, the plaintiff conceded that he was not bringing a separate claim based on his exclusion from the 2007 search. In deciding the motion to dismiss, I noted the plaintiff's concession and dismissed the complaint to the extent that it could be construed as stating a claim based on the 2007 search. <u>See</u> Oct. 31, 2014 Order at 3, ECF No. 16. Thus, the decision to exclude the plaintiff from the 2007 search is not an independent ground for relief. However, in my decision on the motion to dismiss, I also noted that the plaintiff could develop the facts surrounding the 2007 decision and use them to support his claim that the department's later decisions were discriminatory. <u>Id.</u> at 3–4. But at this point, it is clear that the facts surrounding the 2007 decision do not support the plaintiff's other claims. The plaintiff admits that he was excluded from the 2007 search because of Frankowski's policy against hiring new faculty members with degrees from UWM. <u>See</u> Def. PFOF ¶¶ 42–53 (admitted). And the plaintiff does not point to any evidence from which a reasonable trier of fact could infer that Frankowski adopted the policy in order to prevent the plaintiff from obtaining a full-time position, or that he adopted the policy because of the plaintiff's race, religion, or national origin. Nor does the plaintiff argue that anyone with discriminatory intent played a role in bringing about the policy against further UWM hires. The only person in this case whom plaintiff accuses of harboring discriminatory motives is Dr. David, <u>see</u> Def. PFOF ¶ 126 (admitted), yet the plaintiff admits that David advocated for the <u>removal</u> of the UWM restriction so that the plaintiff could be considered for a full-time faculty position, <u>see</u> Def. PFOF ¶ 64 (admitted). Thus, the decision to exclude the plaintiff from the 2007 search

15

does not suggest that any of MSOE's later decisions were discriminatory. I now turn to the question of whether summary judgment is required as to any of the later decisions.

The first employment action at issue is the mathematics department's decision, following the faculty vote in 2010, to proceed with a candidate search rather than simply promote the plaintiff to the full-time faculty position that was open at that time.[1] An initial question is whether the plaintiff's claim involving the decision to proceed with a search should be evaluated under the direct method or the indirect method. In his brief, the plaintiff indicates that he is proceeding under the indirect method with respect to his failure-to-promote claims. See Br. in Opp. to Summ. J. at 7, ECF No. 54.[2] However, the indirect method does not fit the situation presented here, because no one outside of the protected classes was automatically promoted to the position the plaintiff wanted. Still, the plaintiff seems to contend that he can make out a prima facie case of discrimination under the indirect method because MSOE promoted Nancy Olmsted from the part-time faculty to the full-time faculty without first conducting a search.[3] The plaintiff seems to be arguing that because Olmsted is outside the protected class and was treated more favorably than him, he has made out a prima facie case of discrimination under the indirect method. However,

---

[1]MSOE contends that the department's decision to proceed with a search rather than hire the plaintiff without conducting a search, along with its eventual decision to defer the search for a year, are not "adverse employment actions." However, for purposes of this motion, I will assume without deciding that they are.

[2]The plaintiff mentions the direct method of proof only in connection with his retaliation claim. See Br. at 20.

[3]The record does not reflect precisely when MSOE promoted Olmsted to the full-time faculty. However, the plaintiff testified at his deposition that it occurred before he came to MSOE in 2007. Al-Hasan Dep. at 61.

16

Olmsted is not a proper comparator, because she was not promoted to a position that is analogous to the position the plaintiff sought. See Hooper v. Proctor Health Care, Inc., 804 F.3d 846, 853 (7th Cir. 2015) (noting that lack of evidence of proper comparator is fatal to claim under the indirect method). Rather, she was promoted to the position of Instructor, which does not come with the same tenure-like benefits as does a full-time professorship. The plaintiff admits that the Instructor position is different than a full-time professorship and that he did not want to be promoted to the full-time faculty at the Instructor level. Def. PFOF ¶¶ 13, 24 (admitted). The plaintiff has not shown that MSOE ever promoted a part-time faculty member to the full-time faculty at the professor level without first conducting a search. Moreover, when MSOE promoted O'Neill and Fuhrman (who are not Palestinian, Muslim, or Arabian) to the full-time faculty at the professor level in 2007, it did so only after performing a search for external candidates. Def. PFOF ¶ 43 (admitted). In light of this evidence, the conversion of Olmsted does not give rise to a prima facie case that the plaintiff was treated differently because of his race, religion, or national origin. Rather, the undisputed facts establish that MSOE always performed a search before promoting someone to the full-time faculty at the professor level, regardless of that person's race, religion, or national origin.

As I have already indicated, the plaintiff does not mention the direct method of proof in connection with his failure-to-promote claims. However, the plaintiff appears to make arguments that are properly classified as direct-method arguments. Specifically, he argues that circumstantial evidence would allow a reasonable jury to infer that Dr. David was biased against Muslims and/or Palestinians and for that reason made efforts to ensure that the plaintiff was not promoted to the full-time faculty. Thus, I will evaluate the plaintiff's

17

claim that the decision to proceed with a search was discriminatory under the direct method.

Here, to make out a claim under the direct method, the plaintiff must show that a reasonable jury could reach two conclusions: (1) that David was biased against Muslims, Palestinians, and/or Arabians, and (2) that David's bias was a proximate cause of MSOE's decision to proceed with a search rather than automatically promote the plaintiff. Proof of the latter is needed because David did not unilaterally make the decision to proceed with a search. Rather, the faculty as a whole voted to proceed with a search, and the plaintiff does not allege that any faculty member other than David was biased against Muslims, Palestinians, or Arabians. Def. PFOF. ¶ 126 (admitted). Thus, the plaintiff must proceed on a "cat's paw" theory, which applies when a biased employee "who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." See Woods v. City of Berwyn, 803 F.3d 865, 869 (7th Cir. 2015); see also Shager v. Upjohn Co., 913 F.2d 398, 404–05 (7th Cir. 1990) (noting that cat's paw theory applies when an unbiased committee makes decision to take employment action at the recommendation of a supervisor who acts with discriminatory animus). The Supreme Court has held that the cat's paw theory will result in an employer's liability where (1) a supervisor performs an act motivated by discriminatory animus that is intended by the supervisor to cause an adverse employment action, and (2) that act is a proximate cause of the ultimate employment action. Staub v. Proctor Hosp., 562 U.S. 411, 422 (2011).

I conclude that the plaintiff cannot survive summary judgment under the direct method because he has not produced evidence from which a reasonable jury could infer

18

that David was biased against Muslims, Palestinians, or Arabians.  The plaintiff contends that the following evidence allows a reasonable jury to infer that David was biased: (1) the plaintiff's own testimony that he felt that David treated him differently following the death of Olmsted's son in Iraq; (2) the plaintiff's testimony that Griggs told him that he (Griggs) told other faculty members, including David, that the plaintiff was not an "extreme Muslim"; (3) David's email to then-Congressman Kirk regarding the Israeli-Palestinian conflict; (4) the fact that David posted a Christmas card from a job applicant on the department's bulletin board; (5) the fact that David posted an opening for a position in Alaska on the department's bulletin board and told the plaintiff that he should apply for it; (6) the fact that David once told the plaintiff that he was considering giving the plaintiff's office to a high school teacher; and (7) David's efforts to convince the plaintiff that he (David) is not Jewish.  However, none of this evidence, either in isolation or cumulatively, gives rise to a reasonable inference that David was biased against Muslims, Palestinians, or Arabians.

First, the plaintiff's testimony that he felt a change in David's treatment of him following the death of Olmsted's son in 2008 is not evidence that David was biased.  The plaintiff does not describe any specific ways in which David treated him differently following the death of Olmsted's son.  Moreover, the plaintiff's testimony that he felt that David made it his personal agenda to prevent the plaintiff from obtaining a full-time position is not competent evidence of bias.  The plaintiff's subjective belief as to David's motives amount to no more than speculation as to David's state of mind, which is inadmissible at summary judgment and at trial.  See, e.g., Widmar v. Sun Chem. Corp., 772 F.3d 457, 460 (7th Cir. 2014).

19

Second, the evidence concerning Griggs and the "extreme Muslim" comment does not give rise to an inference that David was biased against Muslims.[4] No evidence in the record provides any context for Griggs's statement to the other faculty members, and thus the jury would be left to speculate as to its significance, if any. From the mere fact that Griggs said he told a group that included David that the plaintiff was not an extreme Muslim, a jury could not reasonably infer that David had made a comment indicating that he was biased against the plaintiff because of his religion. Moreover, Griggs himself has submitted a declaration in which he states that David never asked him whether he thought the plaintiff was an extreme Muslim or otherwise indicated that David thought the plaintiff might be an extreme Muslim. Griggs Decl. ¶ 3, ECF No. 46. Thus, Griggs's statement does not support the conclusion that David was biased against the plaintiff because he was Muslim.

Third, David's email to then-Congressman Kirk regarding Kirk's stance on the Israeli-Palestinian conflict does not give rise to an inference that David was biased against Palestinians. Any reasonable juror who reads the email would understand that the email was sarcastic and that David was actually criticizing Kirk's pro-Israel stance.

Fourth, David's posting a Christmas card addressed to the department's search committee on the departmental bulletin board is not evidence of bias against Muslims. The

_____

[4]MSOE contends that Griggs's statement to the plaintiff about what he told the other faculty members is inadmissible hearsay. The plaintiff asserts that the statement is not hearsay because Griggs was MSOE's employee and the statement concerned a matter within the scope of his employment. See Fed. R. Evid. 801(d)(2)(D). It is debatable whether Griggs's statement to the plaintiff about what happened in a conversion with other faculty members concerned a matter within the scope of Griggs's employment relationship. However, because I conclude that the statement does not support the plaintiff's argument even if it is admissible, I need not resolve this issue at this time.

20

mere act of displaying a Christmas card sent by a third party to members of the department in a spot where those members could see it does not give rise to a reasonable inference of bias against non-Christians, much less to a reasonable inference of bias against Muslims specifically.

Fifth, David's posting the Alaska job opening on the bulletin board and remarking to the plaintiff that he should apply for it because of the good fishing in Alaska is not evidence of bias against Muslims, Palestinians, or Arabians. At worst, the comment could be interpreted as David implying that he wanted the plaintiff to leave the department. But it does not give rise to the further inference that David wanted the plaintiff to leave the department because he was Muslim, Palestinian, or Arabian. If other evidence in the record suggested that David was biased against the plaintiff because of his race, religion, or national origin, then perhaps the Alaska comment would support an inference that David took adverse actions against the plaintiff for those reasons. But, as discussed, the plaintiff has not produced any such evidence. Thus, the comment about the Alaska job opening does not give rise to an inference of discriminatory animus.

For similar reasons, David's comment to the plaintiff about giving the plaintiff's office to a high school teacher does not give rise to an inference that David was biased against the plaintiff because of his race, religion, or national origin. At worst, the comment could be interpreted as David implying that, for some reason, he wanted the plaintiff to leave the department. The comment does not imply that the reason was the plaintiff's race, religion, or national origin. And again, the plaintiff has produced no other evidence to support the inference that David wanted the plaintiff to leave the department because he was Muslim, Palestinian, or Arabian.

Finally, David's effort to convince the plaintiff that he is not Jewish does not suggest that he was biased against Muslims, Palestinians, or Arabians. What it suggests is that David did not want the plaintiff to think that he was Jewish. David's actions might also support the inference that David was sensitive about being mistaken for a Jew, but even if so, that would not support the inference that he was biased against the plaintiff because he was Muslim, Palestinian, or Arabian.

Because the plaintiff has not produced evidence from which a reasonable jury could conclude that David acted with discriminatory animus, I need not consider whether David's actions were the proximate cause of the department's decision to proceed with a search—i.e., whether David used the department as his cat's paw. However, I note that the Seventh Circuit has stated that "[l]iability under that theory can be imposed where a non-decision-making employee with discriminatory animus provided factual information or input that may have affected the adverse employment action." Matthews v. Waukesha County, 759 F.3d 821, 829 (7th Cir. 2014). Here, according to the plaintiff, David provided "factual information or input that may have affected the adverse employment action." Specifically, the plaintiff contends that, before allowing the faculty to vote on whether to promote the plaintiff without a search, David stated that he had surveyed other departments and learned that the current general practice was to conduct a search rather than to simply promote existing part-time faculty. The plaintiff also contends that David told the faculty that he believed the school's president, Viets, would not approve the department's recommendation for the position unless the department first performed a

search.[5]  A jury could reasonably infer that these statements influenced the department's decision.  However, I note that David's influence over the committee did not take the form of providing false information or biased information about the plaintiff, which is usually what results in cat's paw liability.  See Johnson v. Koppers, Inc., 726 F.3d 910, 915 (7th Cir. 2013) (noting that cat's paw theory involves an employee with discriminatory animus "concoct[ing] a false story" about the plaintiff and relaying that story to the decisionmaker); Cook v. IPC Int'l Corp., 673 F.3d 625, 628 (7th Cir. 2012) (giving example of cat's paw theory involving subordinate's making a false report against the plaintiff with hope that the decisionmaker will terminate the plaintiff based on the false report).  Rather, David conveyed information to the faculty that, so far as the record reveals, was true—i.e., that other departments usually search rather than promote and that Viets was unlikely to approve the department's choice unless the department conducted a search.[6]  Because David's information was true and was the kind of information one would expect a

_____

[5]MSOE contends that because the plaintiff was not present at the meeting, he lacks personal knowledge of what David said and is relying on what other faculty members who were present told him about the meeting—i.e., statements that are inadmissible as hearsay.  The plaintiff contends that the statements are not hearsay because they were made by MSOE's employees in the scope of their employment.  See Fed. R. Evid. 801(d)((2)(D).  As I noted in connection with Griggs's "extreme Muslim" statement, it is debatable whether other faculty member's statements to the plaintiff about what happened in meetings that the plaintiff did not attend are within the scope of the faculty members' employment.  For purposes of the present motion, I will assume without deciding that the other faculty's statements to the plaintiff about what happened during the meeting are admissible.

[6]The plaintiff has pointed to no evidence suggesting that other departments at MSOE promoted internal candidates to full-time professorships without performing a search.  Further, Viets has submitted a declaration in which he states that, during his presidency, he "never supported a 'conversion' of a Part-Time Faculty to Full-Time Faculty without a national search."  Viets Decl. ¶ 9, ECF No. 42.

23

department chair to convey to his department before they voted on whether to promote the plaintiff without a search, it is debatable whether David's purported animus was a proximate cause of the department's decision. Rather, the faculty members considered the reasons given by David and made independent decisions as to whether, in light of those reasons (which were not products of David's animus) the department should proceed with a search. Thus, one could argue that the faculty's vote "broke the causal chain" between David's purported animus and the adverse employment decision. See, e.g., Woods v. City of Berwyn, 803 F.3d 865, 869–72 (7th Cir. 2015) (noting that decisionmaker's independent investigation can break the causal chain in cat's paw case). However, because it is not clear whether David's supplying true and untainted information to the faculty does in fact break the causal chain even if David himself was biased, I will not grant summary judgment on that basis. Instead, I will grant summary judgment based on the lack of evidence that David was biased against Muslims, Palestinians, or Arabians in the first place.

The second employment action at issue in this case is the decision to defer the search for a full-time faculty member for one year because the plaintiff had submitted letters of recommendation written by members of the search committee. Again, the indirect method of proof does not fit this situation. Deferring the search meant that no candidate was hired or promoted, and thus the plaintiff cannot identify a comparator. However, I will analyze the plaintiff's claim that the decision to defer the search was discriminatory under the direct method.

No evidence in the record supports the inference that MSOE's decision to defer the search was motivated by the plaintiff's race, religion, or national origin. Rather, the

evidence makes clear that MSOE deferred the search because five members of the search committee wrote the plaintiff letters of recommendation, which Berry and others viewed as creating a conflict of interest. The plaintiff does not contend that Berry harbored discriminatory motives or that he used the perceived conflict of interest as a pretext to discriminate against the plaintiff on the basis of his race, religion, or national origin. See Def. PFOF ¶ 126 (plaintiff admits that no one besides David discriminated against him on the basis of his race, religion, or national origin). As I have already discussed, although the plaintiff claims that David harbored discriminatory motives, he has not produced evidence from which a reasonable jury could accept this claim.

Moreover, even if David harbored discriminatory motives, no evidence suggests that he orchestrated the events that resulted in MSOE's decision to cancel the search. MSOE cancelled the search after an anonymous faculty member informed Berry that he or she believed that the plaintiff's receiving letters of recommendation from members of the search committee created procedural irregularities. No evidence suggests that David authored the anonymous letter, and no evidence suggests that David did anything to influence Berry's response to the letter. Although David participated in the department's decision to cancel the search after Berry brought the conflict of interest to his attention, a reasonable jury could not conclude that it was David's discriminatory animus, rather than Berry's and the other faculty members' concern over the potential conflict of interest, that caused MSOE to defer the search. Thus, a reasonable jury could not conclude that David's alleged discriminatory animus was a proximate cause of MSOE's decision to defer the search.

Case 2:14-cv-00611-LA   Filed 12/23/15   Page 25 of 29   Document 60

The remaining employment action is MSOE's decision, following the 2011–12 search, to hire van Groningen for the full-time position rather than the plaintiff. I will evaluate this decision under the indirect method, which is the method that the plaintiff relies on in his brief. MSOE concedes that the plaintiff has established a prima facie case. Br. in Supp. at 19, ECF No. 39. In response to the prima facie case, MSOE contends that it hired van Groningen rather than the plaintiff because van Groningen received more support from the faculty search committee than the plaintiff. The plaintiff contends that MSOE's reliance on the committee vote is a pretext for unlawful discrimination. Specifically, he contends that David was biased against him because of his race, religion, and national origin, and that David exercised influence over the other members of the search committee and caused them to vote against the plaintiff.

As I have already discussed, the plaintiff has not produced evidence from which a reasonable jury could find that Dr. David was prejudiced against the plaintiff because of his race, religion, or national origin. Moreover, the plaintiff does not contend that any other members of the department, or MSOE's president and vice president (who accepted the department's recommendation to hire van Groningen), were prejudiced against him for these reasons. For this reason alone, the plaintiff has not carried his burden to demonstrate that MSOE's reason for hiring van Groningen over him is pretextual.

Moreover, even if the plaintiff had produced evidence from which a reasonable jury could infer that David was prejudiced against him, his claim would fail because he has not produced evidence from which a reasonable jury could infer that David exercised so much influence over the other faculty members that the committee acted as a mere conduit of his discrimination. The plaintiff contends that the faculty members in the mathematics

26

department were generally "intimidated" by Dr. David, who was the chair of the department. Al-Hasan Dep. at 170. However, the plaintiff has produced no evidence to support his subjective belief that the other faculty members were intimidated by David. The plaintiff does not, for example, point to evidence that David threatened to reduce teaching loads, assign faculty members to undesirable courses, or take other adverse actions against them if they did not bow to his wishes. Further, the plaintiff points to no evidence giving rise to an inference that the other faculty members understood that David wanted the department to select someone other than the plaintiff to fill the full-time position. Thus, even if faculty members were generally intimidated by David (and there is no evidence that they were), there is no evidence that David intimidated the other faculty members into voting against the plaintiff.

The plaintiff finds it suspicious that he received so many negative votes from the committee when the committee was mostly composed of faculty members who had written him letters of recommendation during the prior year's aborted search. Br. in Opp. at 20, ECF No. 54. However, one of the five faculty members who wrote the plaintiff a letter of recommendation, Olmsted, was not on the search committee that selected van Groningen. The remaining four recommenders were on that search committee, but three of them voted in favor of hiring the plaintiff—Yaz, Griggs, and O'Neill. Only one of the five recommenders, Jorgensen, voted against the plaintiff. The fact that one out of five of the plaintiff's former recommenders voted against the plaintiff does not give rise to a reasonable inference that David caused members of the search committee to vote against the plaintiff.

In his remaining claim, the plaintiff alleges that the decision to hire van Groningen rather than him for the full-time decision was retaliation for filing a complaint with the EEOC in June 2011.[7]  The plaintiff states in his brief that he intends to prove retaliation under the direct method.  Br. in Opp. at 20, ECF No. 54.  To prove retaliation under the direct method, the plaintiff must provide sufficient direct or circumstantial evidence to establish (1) that he engaged in protected conduct, (2) that he suffered an adverse employment action, and (3) that there was a causal connection between the two.  Leitgen v. Franciscan Skemp Healthcare, 630 F.3d 668, 673 (7th Cir. 2011). There is no dispute that the plaintiff engaged in protected conduct when he filed a charge of discrimination with the EEOC or that MSOE's failing to promote the plaintiff to the full-time faculty in 2012 was an adverse employment action.  The only question is whether plaintiff's filing the complaint was causally connected to MSOE's failure to promote him.

The plaintiff contends that David was the faculty member with the retaliatory motive and that David used his influence as the department chair to cause the other members of the search committee to vote against him at the end of the 2012 search.  However, as just discussed, the plaintiff has not produced evidence from which a reasonable jury could infer

_____

[7]As noted in the background section, in November 2010, the plaintiff went to MSOE's human-resources department and told someone in that department that he believed the department's decision to proceed with a search rather than simply promote him to a full-time position was discriminatory.  I do not understand the plaintiff to be alleging that anyone at MSOE retaliated against him for making this complaint.  In any event, there is no evidence that anyone involved in the decision to hire van Groningen in 2012 even knew about the plaintiff's complaint to human resources in November 2010. Thus, even if the plaintiff were claiming that MSOE retaliated against him for making a complaint to human resources in November 2010, the defendant would be entitled to summary judgment on that claim.

28

that David influenced the other committee members or caused them to vote against the plaintiff during the search.

Moreover, even if a reasonable jury could conclude that David influenced the vote, the jury could not also conclude that he did so in order to retaliate against the plaintiff for filing the EEOC complaint. In support of his claim that David wanted to retaliate against him, the plaintiff points to the email David sent to human resources after learning that the plaintiff had filed a complaint with the EEOC. In that email, David sarcastically remarked that he hoped the plaintiff would not add David's assigning him a window office to his list of complaints. However, this email does not support an inference that David intended to retaliate against the plaintiff for filing a complaint with the EEOC. It merely suggests that David did not think that the complaint had merit. Accordingly, the MSOE is entitled to summary judgment on the plaintiff's retaliation claim.

## III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendant's motion for summary judgment is **GRANTED**. The Clerk of Court shall enter final judgment.

Dated at Milwaukee, Wisconsin, this 23rd day of December, 2015.

s/ Lynn Adelman

_____
LYNN ADELMAN
District Judge

29